Slip Op 17 - 36

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| DIAMOND SAWBLADES<br>MANUFACTURERS' COALITION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Before: R. Kenton Musgrave, Senior Judge |
| | : | |
| UNITED STATES, | : | Consol. Court No. 15-00164 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| BEIJING GANG YAN DIAMOND<br>PRODUCTS COMPANY, GANG YAN<br>DIAMOND PRODUCTS, INC., CLIFF<br>INTERNATIONAL LTD., HUSQVARNA<br>CONSTRUCTION PRODUCTS NORTH<br>AMERICA, INC., HEBEI HUSQVARNA-JIKAI<br>DIAMOND TOOLS CO., LTD., WEIHAI<br>XIANGGUANG MECHANICAL INDUSTRIAL<br>CO., LTD., BOSUN TOOLS CO., LTD., and<br>BOSUN TOOLS INC., | : | |
| | : | |
| Defendant-Intervenors. | : | |

## OPINION AND ORDER

[Remanding fourth administrative review of antidumping duty order on diamond sawblades and parts thereof from the People's Republic of China.]

Dated: March 31, 2017

*Daniel B. Pickard*, *Maureen E. Thorson*, and *Stephanie M. Bell*, Wiley, Rein & Fielding, LLP, of Washington, DC, for plaintiff.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant. With him on the brief were *Benjamin*

*C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White*, *Jr.*, Assistant Director.   Of Counsel on the brief was *David P. Lyons*, Attorney-International, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

*Jeffrey S. Neeley* and *Michael S. Holton*, Hush Blackwell, LLP, of Washington, DC, for defendant-intervenors Beijing Gang Yan Diamond Products Company and Gang Yan Diamond Products, Inc..

*Gregory S. Menegaz*, *J. Kevin Horgan*, and *Alexandra H. Salzman*, deKeiffer & Horgan, PLLC, of Washington, DC, for defendant-intervenors Bosun Tools, Co., Ltd. and Bosun Tools Inc.

Musgrave, Senior Judge:  This consolidated suit concerns the record of the fourth of the administrative reviews of diamond sawblades ("DSBs") and parts thereof from the People's Republic of China ("PRC").  *See Diamond Sawblades and Parts Thereof From the PRC*,  80 Fed. Reg. 32344 (June 8, 2015) (final results of antidumping duty administrative review; 2012-2013) ("*Final Results*"), as explained by its accompanying issues and decision memorandum, Public Record Document ("PDoc") 354 (June 2, 2015) ("*IDM*").  The review's preliminary results had been published six months earlier, *Diamond Sawblades from the PRC*, 79 Fed. Reg. 71980 (Dec. 4, 2014) ("*Preliminary Results*"), PDoc 324, as articulated in its accompanying preliminary decision memorandum ("*PDM*"), PDoc 307, which was approximately eleven months after the review's initiation in December 2013, covering the November 1, 2012, through October 31, 2013 period of review ("POR").

The *IDM* explains Commerce's reasoning, *inter alia*, on its (1) selection of surrogate financial statements, (2) valuation of steel cores, and (3) assignment of the PRC-wide rate of 82.05 percent to the "ATM entity," of which Beijing Gang Yan Diamond Products, Co. ("BGY") and Gang

Yan Diamond Products, Inc. ("GY") (together with BGY, "Gang Yan") are part.[1]  Diamond

Sawblades Manufacturers' Coalition ("DSMC") challenges those first two matters while Gang Yan

challenges the latter.

Jurisdiction here is proper under 28 U.S.C. §1581(c), pursuant to which final

determinations of the International Trade Administration, U.S. Department of Commerce

("Commerce" or "Department") will be upheld unless found "to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C. §1516a(b)(1)(B)(i).

For the following reasons, the matter requires remand.

*Discussion*

I.  Valuation of Steel Cores

As part of the review, Commerce once again had to determine surrogate values for

all of the factors of production ("FOPs") for DSBs, in particular for steel cores, which are a major

DSB input and subject merchandise in their own right.

A.  Background

In the original investigation, Commerce valued the steel cores using import data for

Indian Harmonized Tariff Schedule ("HTS") provision 7326.19.00  in accord with its preference for

valuing input factors using official import data.[2]  In subsequent administrative reviews, however,

---

[1]  BGY along with Advanced Technology & Materials Co., Ltd. and three other affiliated companies has been treated in all segments of the antidumping proceeding thus far as collapsed into a single "ATM entity."  *See IDM* at 2.  The papers do not elaborate on GY, in particular whether it is an independent entity apart from BGY, *cf.*, *e.g.*, *id.*, but they evince uniform regard of GY as also part of the ATM entity.

[2]  *See*, *e.g.*, *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 78
(continued...)

Commerce abandoned this approach after deciding that the tariff schedules of its choice of primary surrogate country (*i.e.*, Thailand) did not provide a reasonable analogue for the cores themselves, and it resorted to valuing both self-produced and purchased cores based on the FOPs reported by respondents for producing them, *i.e.*, a "build-up" methodology.[3]  *See IDM* at 38.

For the matter at bar, during the course of the administrative review DSMC urged Commerce to (re)consider using Thai HTS subheading 8202.31.10 for surrogate valuation of DSB steel cores.  DSMC pointed out that this subheading reflected an amendment of Thai HTS heading 8203 to provide for merchandise that was highly similar, if not commercially identical, to cores for DSBs.  *See generally* PDoc 232.  In particular, DSMC argued, the subheading covers steel "toothed blanks", *i.e.*, cores, for circular sawblades, and they averred that the provision was specific to cores for circular sawblades with a working edge of steel.  *Id.*  DSMC also placed information on the record indicating that the production process used and costs incurred to make steel cores for DSB cores and cores with metal working parts were largely identical.  *See* CDoc 174, PDoc 226, at Att. 1.

---

[2]  (...continued)

Fed. Reg. 11143 (Feb. 15, 2013) (final results of admin. rev.; 2009-2010) and accompanying issues and decision memorandum ("I&D Memo") at cmt. 11 ("we prefer country-wide information such as government import statistics to information from a single source and we prefer industry-wide values to values of a single producer because industry-wide values better represent prices of all producers in the surrogate country.").

[3]  *See id*.; *Diamond Sawblades and Parts Thereof Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 36166 (June 17, 2013) and accompanying I&D Memo at cmt. 8; *Diamond Sawblades and Parts Thereof Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 35723 (June 24, 2014) and accompanying I&D Memo at cmt. 12.

Commerce preliminarily rejected reliance upon Thai HTS 8202.31.10 after finding that the resulting surrogate value was "unreasonably high."  *See* PDoc 314-15 at 7.  Rather, according to the defendant, Commerce continued to follow its recent "build-up" practice, in this instance by relying on purchases from unaffiliated suppliers Bosun Tools Co., Ltd. ("Bosun") and Weihai Xiangguang Mechanical Industrial Co., Ltd. ("Weihai"), the two mandatory respondents selected for individual examination, with the addition of surrogate values for steel, labor, and electricity used to produce the cores.  Def.'s Resp. at 4, citing *PDM* at 22; Preliminary Surrogate Value Memo, PDoc 314, at 7.  Commerce justified continued reliance on its build-up methodology due to the absence of "appropriate HTS codes or other data source we can rely on to value cores directly."  *Id*.

Commerce then verified Weihai's FOPs information between January 26 and 30, 2015, including the information Weihai had provided for steel cores used to produce subject merchandise.  Weihai Verification Report (Feb. 20, 2015), PDoc 349, CDoc 271, at 1, 10.  The verification report summarizes Weihai's opinion that Thai HTS item 8202.31 does not cover diamond sawblade cores.  *Id*.

In its administrative case brief, DSMC sought to rebut the preliminary finding that the Thai surrogate produced "unreasonably high" results.  *See* CDoc 275, PDoc 356 at 4-8.  It did so by comparing the average unit value ("AUV") of import data for Thai HTS 8202.31.10 with the prices at which Weihai actually purchased cores*. Id.*  Regarding that subheading's coverage, DSMC asserted that steel cores for sawblades with working edges of different materials are made according to highly similar production processes, such that any differences in producing steel cores for sawblades with steel working parts and those with working parts of diamond segments do not

meaningfully impact their costs. *Id.* at 10-11.  DSMC further argued that Commerce's build-up of

the respondents' FOPs for self-produced cores did not adequately account for the value of purchased

cores insofar as the build-up method produced valuations that were [[                        ]] than the

prices at which the respondents actually purchased cores. *Id.* at 8-9.  Further, DSMC argued that

given the fact that respondents did not produce [[



                                                                        ]]. *Id.* at 9-10.  Thus, DSMC argued, the

agency's preliminary core valuation methodology did not produce accurate results.

      Considering that argument, Commerce continued to credit Weihai's opinion that Thai

HTS 8202.31 does not cover DSB cores and to find that the products covered by Thai HTS

subheading 8202.31.10 are "different from" DSB cores, and that when it can value cores respondents

purchased from NME suppliers using the inputs they used to self-produce the identical types of cores

(*i.e.*, DSB cores), it need not "resort to an AUV derived from a Thai HTS subheading for

merchandise different from cores for diamond sawblades (with the exception of a circular physical

appearance in general)." *IDM* at 38-39.  Explaining more fully:

> In the last review, with the petitioner's support, we decided that this build-up
> methodology is the best methodology to value cores in the absence of a better
> alternative.[ ] We do not consider that an AUV based on an HTS subheading for
> nonidentical products is a better alternative to the build-up methodology, which is
> based on the inputs for the production of the identical products, cores for diamond
> sawblades.  Even if the build-up methodology uses inputs consumed for the
> production of cores with specifications different from the cores purchased from NME
> suppliers, we find that such differences within the identical products, cores for
> diamond sawblades, do not justify the use of the alternative valuation methodology
> the petitioner proposes.
>
> We find that the prices Weihai paid to its unaffiliated NME suppliers and the
> petitioner used in its price comparisons are unsuitable as benchmarks to determine

whether the petitioner's suggested AUV is reasonable because these prices are (1) Weihai's business proprietary information and thus do not necessarily represent industry-wide prices available to other producers and (2) NME prices presumably distorted by the PRC government interference.[ ]  Accordingly, we did not rely on Weihai's actual NME purchase prices for our decision not to use the petitioner's proposed AUV.

We also find that the petitioner's methodology in attempting to demonstrate the reasonableness of its proposed AUV itself is flawed because the petitioner did not take into account the weight of the cores that Weihai purchased from NME suppliers when the petitioner used the NME prices of these cores in its demonstration.  We tested the petitioner's methodology by taking into account the weight of these cores and we found that the petitioner's proposed AUV overvalues cores much more than the petitioner claims in its demonstration.[ ] This leads us to conclude that the petitioner's demonstration methodology is flawed because, by averaging the weight of all cores Weihai reported, the petitioner's demonstration methodology masks the fact that valuing certain cores with this AUV, $32.45/kg, can result in valuing cores at much higher prices than the petitioner claims with its demonstration.  Both Bosun and Weihai reported cores in a weight/piece basis for each CONNUM.[ ]  So, for example, if a particular core a respondent purchased from an unaffiliated NME supplier can be reasonably valued at $32.45/piece in Thailand, this core weighs 10 kilograms, and the respondent reported this core on a kilogram/piece basis for a CONNUM in its FOP database, then the use of this AUV would result in valuing this core at $324.50/piece, which is 10 times higher than the reasonable surrogate price, $32.45/piece.

*Id*. at 39 (footnotes omitted).   Thus, for the *Final Results*, Commerce continued to value all

respondent cores using build-up methodology based on the respondents' reported FOPs, rather than

using Thai import data for toothed blanks.  *Id*. at 38-40.

## B.  Analysis

            The record persuades that remand of this DSB core valuation issue is necessary for

three broad reasons.  First, DSMC is correct that there is no guidance in the record from which to

adduce what is or is not "unreasonably high," which is akin to asking "how high is 'up'?"  There is

nothing inherently unreasonable about a method that produces a value that is ten times higher (or

lower) than the compared value when the reliability of the latter is uncertain, as Commerce indicated, *see supra*, and the reader has no way of knowing from the record if a 10-kilogram core "can be reasonably valued at $32.45/piece in Thailand".

Second, the defense here is that rejection of DSMC's analysis of the Thai surrogate value, an analysis that compared the Thai AUV with Weihai's purchase prices from NME suppliers, was proper because that analysis was (1) based on proprietary NME prices that do not necessarily represent industry-wide prices available to other producers, and (2) did not properly take core weight into account. Def.'s Resp. at 32; Bosun's Resp. at 4-5. But Commerce itself compared the Thai surrogate value against Weihai's own NME purchase prices,[4] *supra*, and the finding that Weihai's purchase prices "do not necessarily" represent "industry-wide" prices at which other PRC suppliers might be able to purchase cores appears unsupported. *See* DSMC's Br. at 13-14. Either Commerce believes it is appropriate to use Weihai's purchase prices to test the reasonableness of the surrogate value or it does not; it cannot have it both ways.

Regarding the agency's conclusion that the Thai AUV method results in overvaluation, the conclusion is based on cores selected from Weihai's NME purchases for use in production that are atypical of Weihai's average core weight. *Cf.* CDoc 283, PDoc 377 at 4, *with* CDoc 275, PDoc 356, at 7 (establishing average weight of Weihai's cores). Thus, while faulting DSMC's analysis for inadequately taking core weight into account, Commerce does not appear to have considered whether its own build-up methodology adequately considered core weight. DSMC

---

[4] One might assume that the wider the results diverge from Weihai's actual purchase prices, the more unreasonable the method used to produce the comparison becomes. That, however, assumes that the actual purchase prices form a reliable benchmark in this first place, which, in the case of Weihai's NME purchases, Commerce has already rejected.

more fully elucidates by example the core valuations produced by the build-up methodology as compared with those cores' purchase prices in its confidential briefs, but its presentment makes clear that the build-up methodology suffers from the same "problem," albeit inverted, that formed the agency's logical basis for rejecting the DSMC's proposed Thai surrogate valuation method, *i.e.*, that the build-up methodology in this review apparently produces "unreasonably low" valuations for many certain cores when applying an inverted "unreasonably high" standard thereto that Commerce apparently used to evaluate DSMC's Thai HTS method on the record.[5]

Third, although Commerce's finding -- to wit, that the products covered by Thai HTS provision 8202.31.10 are "different" from the cores used in production of DSBs -- is not incorrect, it is only accurate insofar as the products covered by Thai HTS 8202.31.10 are not meant to be fitted with diamond segments.[6]  The finding does not meaningfully distinguish products covered by Thai HTS 8202.31.10 from DSB cores to support the outright rejection of that HTS tariff item and the import data therefor as a suitable surrogate.

The sole commonality expressed in the *IDM* is "circular appearance in general".  And indeed, Thai HTS 8202.31.10 covers circular blanks, *e.g.*, cores, for circular saw blades (including slitting or slotting saw blades) with a working edge of steel.  But, DSB cores, to which individual

_____

[5]  DSMC further explains it was and is not seeking to have Weihai's own purchase prices used as the surrogate; rather, it is apparent that DSMC simply used those prices in order to assess the reasonableness of the potential surrogate values while acknowledging that this would be a different issue if the data were used as surrogate values rather than merely as a tool of comparison. DSMC's Br. at 13, citing 19 C.F.R. §351.408(c)(1). Furthermore, DSMC points out, the agency's antidumping duty calculations in general are based, at least in part, on business proprietary data, and this data is used in determining margins for companies other than the submitter.  *Id.*

[6]  *Compare* PDoc 232*, with* PDoc 369 at 38-39.

diamond segments are attached, are (also) circular in profile and "slotted," *i.e.,* have cut-outs and

indentations that on the whole are akin to the squared-off "teeth" covered by Thai HTS 8202.31.10,

*see* PDoc 369 at 4, quoting scope language to the effect that "[d]iamond sawblade cores are circular

steel plates, whether or not attached to non-steel plates, with slots"; further, cores for DSBs are also

produced from steel, *see id.,* through a multi-step process that involves cutting a steel plate or sheet

into the precise shape required (inclusive of slotting), heat-treatment, flattening, and grinding, CDoc

174, PDoc 226 at Att. 1, and cores for circular sawblades with steel edges are produced in largely

the same manner and from the same material, although such cores are generally shaped with pointed

teeth, rather than squared-off slots, *id., see also* PDoc 369 at 5 (describing out-of-scope non-diamond

sawblade cores/blades).[7]  Hence, given the close resemblance of diamond sawblade cores and cores

for blades with a working part of steel, and given record evidence showing that both diamond

sawblades cores and cores for blades with working parts of steel are produced from the same

materials and by the same processes and costs,[8] it is unclear why the agency found products covered

---

[7]  DSMC thus argued that the record showed that, while not completely identical with diamond sawblade cores, Thai HTS 8202.31.10 cores were produced from the same materials and in almost the same manner -- with any production differences being immaterial to their cost. CDoc 174, PDoc 226 at Att. 1 (describing affiant's company's production of blanks for diamond sawblades, carbide sawblades and sawblades with cutting edges of metal, and stating that "the production processes for these different types of blanks are very similar; the differences do not meaningfully impact their production costs."). As further support for the similarities between cores for diamond sawblades and cores for steel-edged sawblades, DSMC pointed out that [[                ]], as did [[                          ]]. *See id.*; CDoc 275, PDoc 356 at 10-11.

[8]  And indeed, [[                                    ]].  *See, e.g.,* CDoc 275, PDoc 356 at 10-11; CDoc 174, PDoc 226 at Att. 1 (describing affiant's company's production of blanks for diamond sawblades, carbide sawblades and sawblades with cutting edges of metal, and stating that "the production processes for these different types of blanks are very similar; the differences do not

(continued...)

by Thai HTS 8202.31.10 meaningfully "different" or why it found the Thai import data *prima facie*

unsuitable as a means of valuing cores; nor, as the DSMC explain more fully in their confidential

reply,[9] does the verification report and its exhibits (referenced in the agency's decision) elucidate

Commerce's thinking.  The court agrees with the DSMC that Commerce appears to have overstated

the differences and failed to address the many similarities.

    As it appears that material and undisputed record evidence shows that the two types

of cores are highly similar, Commerce was compelled to address this evidence.  *See Usinor v. United

States*, 26 CIT 767, 783 (2002) (discussing agencies' "responsibility to explain or counter salient

evidence that militates against [their] conclusions.").  An administrative determination is inadequate

when the agency "entirely failed to consider an important aspect of the problem."  *Motor Vehicle

Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *see also United States v. Nova

---

    [8]  (...continued)
meaningfully impact their production costs.").

    [9]  The cited pages of the report describe Weihai as stating that it did not import DSB cores
into the PRC under subheading 8202.31 of the PRC HTS, and that Thai HTS subheading 8202.31
does not cover cores for diamond sawblades.  CDoc 271, PDoc 349 at 10.  The cited pages of the
accompanying exhibits comprise a [[
    ]], CDoc 266-270, PDoc 347 at Ex. 18, pp. 21-22, a
page from [[                                                                                                                                    ]],
*id.,* p. 23, two pages from [[
    ]], *id.,* pp. 24-25, and four pages from [[
    ]].  *Id.,* pp. *26-29.*
These materials simply show that, as no one has contested, [[

    ]].  As for the pages from the [[                                    ]], these confirm
that [[
    ]].  The  [[

    ]].

*Scotia Food Prods. Corp.*, 568 F.2d 240, 252 (2d Cir.1977) (holding that "[i]t is not in keeping with the rational [agency] process to leave vital questions, raised by comments which are of cogent materiality, completely unanswered.").

Last, but perhaps most importantly, the conclusion that Commerce "[do]es not need to resort" to import data when it "can value" using build-up methodology seems to present a seemingly insurmountable hurdle to arguments in favor of an alternative methodology, which conclusion also glosses over Commerce's previously expressed preference for official import data. *See supra* note 2 and accompanying text.  The DSMC contend the official import data of record comport with "Commerce's practice . . . to prefer surrogate values that are product-specific, representative of a broad market average, publicly available, contemporaneous with the [POR]", *e.g.*, Def.'s Resp. at 35, citing *PDM* 19, but further consideration thereof is for Commerce on remand.

In passing, the court notes the defendant's argument that "Commerce reasonably preferred as the best available information steel cores that are identical, rather than at most merely similar, to those used to produce diamond sawblades." *Id*. at 33.  But this elides over the fact that the "identical" steel cores, to which the defendant refers, are "virtual," *i.e.*, non-existent, and merely the result of build-up cost methodology.  As such, it paints an incomplete picture.  The valuation of "identical" steel cores is the ideal, of course, but analysis of each surrogate valuation method in this instance reveals that both methods produce unreasonable values for certain cores at the heavier or lighter weight core spectrum depending upon the method used, implying that neither DSMC's method nor Commerce's method by itself seems to produce adequately representative surrogate values.  The bottom line here is that, when viewed in light of the record as a whole, Commerce has

not explained or countered "salient evidence that militates against its conclusions", *Usinor,* 26 CIT at 783, and the matter therefore requires reconsideration.

## II. Selection Of Surrogate Financial Statements

DSMC also challenges Commerce's use of the financial statements of Trigger Co. Philippines, Inc. ("Trigger"), a producer of comparable merchandise located in a country not on Commerce's list of economically comparable countries, to value the financial factors. DSMC argues for using those of Tyrolit Thai Diamond Company Limited ("Tyrolit") and K.M.&A.A. Co., Ltd. ("KM"), producers from the primary surrogate country. DSMC's Br. at 5-7.

### A. Background

Commerce has articulated a preference for valuing all FOPs from the primary market economy to be used as a surrogate for the NME country producing the subject merchandise, and familiarity with that process is here presumed.[10] *See* 19 C.F.R. §351.408(c)(2). In NME cases,

---

[10] However, by way of further background, "normal value" is usually determined as the price at which the merchandise in question is sold in the exporting country. NME country domestic "sales of merchandise . . . do not reflect the fair value of the merchandise" because those counties "do[ ] not operate on market principles of cost or pricing structures". 19 U.S.C. §1677(18). The antidumping statute thus requires that normal value for NME countries be determined "on the basis of the value of the [FOPs] utilized in producing the merchandise[,] to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id.* §1677b(c)(1). Commerce's preference for such cases is to use the values of FOPs that prevail in a single "primary" surrogate market economy country that Commerce finds to comport with the statutory requirement of being both (a) economically comparable to the non-market economy country in question and (b) a significant producer of the merchandise in question. *See* 19 U.S.C. §1677b(c)(2); 19 C.F.R. §351.408(c)(2); *see, e.g., Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010). In this instance, and in accordance with established policy, Commerce again regarded the PRC as an NME. *See Diamond Sawblades and Parts Thereof From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2012-2013*, 79 Fed. Reg. 71980 (Dec. 4, 2014) (*Preliminary Results*). Commerce's NME practice for selecting the primary surrogate country involves requesting from the Office of Policy ("OP") a list of potential surrogates with per capita gross national income ("GNI") falling within a range of "comparability" to the GNI

(continued...)

Commerce must also obtain surrogate values for financial factors in addition to those for the physical inputs used in production. *See* 19 U.S.C. §1677b(c); *see also* 19 C.F.R. §351.408(c)(4). For surrogate financial values, Commerce's regulation states that nonproprietary data will be "gathered from producers of identical or comparable merchandise in the surrogate country." 19 C.F.R. §351.408(c)(4).

Commerce's OP list, for the matter at bar, contained six potential surrogate countries, which included Thailand but not the Philippines. Commerce found the six countries "at the same level of economic development as the PRC" based on their "per capita gross national incomes." *PDM* at 12; PDoc 39 at Attachment. Commerce selected Thailand as the primary surrogate country "because it is at the level of economic development of the PRC, because it is a significant producer of merchandise comparable to subject merchandise, and because of the availability and quality of Thai data for valuing FOPs." *IDM* at 5, referencing *PDM* at 12-14.

For the *Final Results*, and as it had in the preliminary determination, Commerce selected Trigger's financial statements for surrogate financial factors after determining that Trigger's represented the only usable financial statements on the record. *IDM* at 47-51. Commerce's position is that Trigger's offers the best available information. *Id.* at 48-51. Commerce recognized that the

---

[10] (...continued)
of the NME in question, identifying among the potential surrogates on the OP list those countries that are producers of comparable merchandise, determining whether any of the countries producing comparable merchandise are "significant" producers of such comparable merchandise, and selecting the country with the best data as the primary surrogate based on an evaluation of data quality. *See Non-Market Economy Surrogate Country Selection Process*, Policy Bulletin 04.1 (Import Admin., U.S. Dep't of Commerce, 2004) ("*Policy Bulletin 04.1*"); *see also Ad Hoc Shrimp Trade Action Committee v. United States*, 36 CIT ___, ___, 882 F. Supp.2d 1366, 1371 (2012). The policy bulletin explains that in cases of "[l]imited data availability" Commerce may "'go off' the OP list "in search of a viable primary surrogate country." *Policy Bulletin 04.1*.

Philippines did not appear on the OP list for this review, but it highlighted that the Philippines is still at "a level of economic development comparable to the PRC." *Id*. at 49 (comparing the per capita GNI of the Philippines ($2,470) to that of Indonesia ($3,420), which is included on the OP list). Commerce also noted its determinations in the prior two reviews of this order that Trigger's financial statements were the best available information to calculate surrogate financial ratios. *Id.* at 47.

Commerce reasoned that it could not use either KM's or Tyrolit's financial statements. It claimed that it could not use KM's statements because the company did not produce subject merchandise during the POR and that the statements lacked detailed line items such as inventories open and closed. *Id*. Regarding Tyrolit, although record evidence indicated that the company did produce comparable merchandise as in the prior review, Commerce determined that the absence of specific line items barred reliance upon Tyrolit's statements to calculate surrogate financial ratios. *Id*. In particular, Commerce claimed that the line item expense for "Raw materials and consumables used" was unclear as to whether it includes direct material costs only or also includes other expenses such as factory overhead, and that the only identifiable line item for manufacturing overhead is "Depreciation", which Commerce determined could not reasonably be deemed the only manufacturing overhead amount, particularly in light of the financial statements for Trigger, the company located in the Philippines upon whose financial statements Commerce ultimately determined to rely.

### B.  Analysis

Commerce's *Policy Bulletin 04.1* covers two possible scenarios: (1) when no country on the OP list meets both criteria of being economically comparable to the NME country and a significant producer of comparable merchandise, and (2) when the OP list includes possible surrogates that are economically comparable to the NME country and significant producers of comparable merchandise but the record lacks adequate data for all countries on the OP list, in which case Commerce "should" request a second list from OP and follow the aforementioned steps to choose a surrogate country, but the bulletin also indicates that adhering to an OP-generated list is not always the solution: "[l]imited data availability sometimes is the reason why the team will 'go off' the OP list in search of a viable primary surrogate country." *Policy Bulletin 04.1*. In either event, Commerce is to follow procedure and provide a memorandum for the record providing "substantive reasons on the record for why . . . . it is a 'significant producer'." *Id*.

*Policy Bulletin 04.1* states that "the country with the best factors data is selected as the primary surrogate country." *Id*. It further indicates that "[a]n additional surrogate is sometimes used to fill factor price 'holes' in the primary surrogate." *Id.* at n. 7. The standards by which Commerce resorts to off-list data are unclear. It is, however, at least clear that in going "off list" to select Philippine data in this matter, Commerce was seeking an additional surrogate to fill factor price "holes" in Thailand's data. *See id.* But, in order to fill such a hole, common sense dictates that a hole must exist in the first place. By extension, that the burden of showing the existence of a hole would be on the party claiming its existence. The burden, thus, is on Commerce to demonstrate the inadequacy of the Thai data.

### 1. Thailand Data

As indicated, two choices were on the record for Thai data: KM and Tyrolit. Commerce avers each failed a critical element of *Policy Bulletin 04.1*. At issue here is whether Commerce accurately concluded that KM did not produce comparable or identical merchandise during the POR, and whether Tyrolit had sufficient data quality. The reasoning that follows demonstrates that Commerce satisfied this burden with regards to both KM and Tyrolit.

### a. KM Financial Statements

DSMC argues that the record evidence sufficed for Commerce to conclude that KM produced comparable or identical merchandise during the POR. DSMC's Br. at 39-41. DSMC's argument depends upon pages from KM's website that postdate the POR by thirteen months.

Commerce determined that the information indicated by those pages are not represented in statements in KM's financial statement, to wit, that during the POR the company KM produced only whetstone, hand glider, and polished stones -- products that are not comparable to subject merchandise. The defendant argues that Commerce therefore reasonably determined that KM's financial statements were not suitable[11] and that, as in *Nails from China*, Commerce placed greater weight on "more reliable financial statements" than on information printed from a company's website. Def.'s Resp. at 28, referencing *IDM* at 47. "Indeed, the facts of this proceeding present an even stronger case than *Nails from China* because the KM webpages relied upon by DSMC postdate

---

[11] In calculating the normal value of merchandise from a nonmarket economy, the statute directs Commerce to use merchandise "comparable to the subject merchandise." 19 U.S.C. §1677b(c)(2). In evaluating whether a company produces "comparable" merchandise, it is Commerce's stated practice to place particular weight on that company's audited financial statements. *IDM* at 47. *See, e.g.*, *Certain Steel Nails from China*, 75 Fed. Reg. 34425 (June 17, 2010) (final results of new shipper rev.) and attached I&D Memo at cmt. 4 (*Nails from China*).

the POR by thirteen months and, as Commerce observed, '[n]othing in these website pages indicates that KM produced [comparable merchandise] during the POR or fiscal year 2013.'"  *Id.*

DSMC argues that Commerce's determination that the KM webpages do not support the conclusion that KM produced comparable merchandise during the POR relies on the assumption that, between the POR and the date DSMC downloaded pages from KM's website, KM altered production from non-comparable to encompass comparable merchandise.  DSMC's Br.at 40-41.

The defendant argues the contrary, that it is DSMC's position that would require Commerce to assume that post-POR information held true during the POR.  Def.'s Resp. at 28.  The defendant further supports this by noting that the post-POR KM webpage information was contradicted by contemporaneous information in KM's financial statements, which showed that KM only produced non-comparable merchandise during the POR.  *Id.*, citing *IDM* at 47.  The defendant continues that consistent with its practice, Commerce placed greater weight on the information contained in KM's own audited financial statements.  *Id.*

DSMC contends Commerce's reasoning turns a blind eye to overwhelmingly reasonable inferences from the record to infer that KM "suddenly," post-POR, had the capacity and capability of producing grinder wheels.  But howsoever unreasonable that may seem to be, in accordance with the substantial evidence standard of review Commerce has the discretion as to how it may reasonably interpret the record, and its determination is apparently consistent with its established practice and the record of this segment.  Commerce determined that KM did not produce comparable or identical merchandise during the POR and that KM's financial statements were unusable consistent with its practice.  The court cannot substitute judgment therefor.  *See*, *e.g.*, *American Spring Wires Corp.  v.  United States*, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984),

quoting *Universal Camera v. NLRB*, 340 U.S. 474, 488 (1951) (internal citations and quotations omitted).

### b. Tyrolit Data

The parties do not dispute that Tyrolit produced diamond sawblades during the POR, the dispute at this point rests on the quality and specificity in Tyrolit's financial statements. Commerce found that these lacked sufficient line-item specificity and necessitated its decision to go off the OP list.

DSMC argues Commerce erred when concluding that Tyrolit's financial statements were deficient and thus not usable. *See* DSMC's Br. at 23-29. In brief, DSMC acknowledges the line item deficiencies identified by Commerce, but it nonetheless argues that the lack of specificity in the Tyrolit statements should be excused due to alleged problems with the Trigger financial statements. *See* DSMC's Br.at 30-31.

The argument is limited to the alleged conflicting standards applied to Trigger and Tyrolit financial statements. *Id*. at 29-38. Here the court is evaluating whether the Tyrolit data was sufficiently lacking such as to necessitate going off-list to fill holes from the primary surrogate country. *Cf. infra* (Trigger's Financial Data). And the "fuzzy" problem here, as the Federal Circuit in *Dorbest* observed, is not only that 19 U.S.C. §1677b(c)(4) simply requires that Commerce select surrogate data from an economically comparable country "to the extent possible", *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1371-72 (Fed. Cir. 2010) ("*Dorbest*"), the court must avoid invasion of the reasonable fact-finding province that is Commerce's.

In the prior administrative review of the antidumping duty order, Commerce determined that the Tyrolit financial statements lacked specific line items necessary to calculate

surrogate financial ratios, *e.g.*, for raw materials, overhead, and financing. Def.'s Resp. at 22, *see also IDM* at 48, n.166, citing *AR3 Final Results* at cmt. 16.   Commerce acknowledged that the financial statements show a line item for "Raw materials and consumables used," and the defendant reiterates that they provide no indication of whether that expense includes just direct material costs or, alternatively, direct material costs in addition to other expenses, such as factory overhead. Def.'s Resp. at 20, citing *IDM* at 48.   This is significant, according to the defendant, because in order to calculate the surrogate manufacturing overhead ratio Commerce must segregate such additional costs from the direct material costs.  *Id*.   Commerce also explained that this lack of detail was only one factor that made the Tyrolit financial statements unusable.  *See IDM* at 48-49.

The defendant further argues that Commerce's preference for statements coming from the primary surrogate country does not cure Tyrolit's financial statements of the deficiencies that render them unusable for calculation of financial ratios. Def.'s Resp. at 20, citing *IDM* at 51.   For its part, DSMC does not contest Commerce's determination that it lacked a basis to discern from the general descriptor "Raw materials and consumables used" whether the category included direct material costs only or additional expenses, such as factory overhead.  *See* DSMC's Br. at 30. Instead, DSMC argues that Commerce held Tyrolit's financial statements to a stricter standard than Trigger's financial statements.   The argument, however, fails to confront directly Commerce's factual determination that Tyrolit's financial statements contained inadequate detail to distinguish direct material costs from other expenses and that such deficiency was a factor rendering Tyrolit's financial statements deficient.  *See IDM* at 48.

Commerce found that the one line item identifiable as "Manufacturing Overhead" was the line item "Depreciation" and it explained that it could not reasonably assume that depreciation

represented the only manufacturing overhead. *Id.* at 49. This contributed to Commerce's evaluation that the Tyrolit financial statements contained insufficient detail to calculate financial ratios. *Id.* at 48-49. The defendant contrasts that point against Trigger's financial statements, which contain multiple manufacturing overhead amounts. Def.'s Resp. at 21.

On the one hand, the defendant's contrast does not detail why a single manufacturing overhead line item is intrinsically insufficient beyond the conclusory and/or speculative statement to that effect. *See* Def.'s Resp. at 21. DSMC, for example, points to Commerce's prior reliance upon a financial statement that listed depreciation as the only manufacturing overhead. DSMC's Br. at 34, citing *IDM* at 49, citing *Xanthan Gum From The People's Republic Of China*, 78 Fed. Reg. 33351 (June 4, 2013) (final determ.) and attached issues and decision memorandum at cmt. 2) ("*Xanthan Gum*"). On the other hand, common sense dictates that it is not unreasonable to infer that manufacturing has more overhead than mere depreciation.

The defendant points out that Commerce distinguished *Xanthan Gum* as reflecting certain "unique circumstances", for example among the record financial statements from the primary surrogate country the financial statements in question were "the only complete and fully translated financial statements." Def.'s Resp. at 22, citing *IDM* at 49; *see Xanthan Gum* I&D Memo at cmt. 2. The court can agree that relying on limited data once, of necessity, does not require Commerce to forever accept questionable data in the future, however the defendant's point appears to undercut its reasoning for going off-list, as *Xantham Gum* rather appears to support using data from the primary surrogate country "to the extent possible". *See* 19 U.S.C. §1677b(c)(4). But be that as it may, Commerce identified an additional reason for why it could not use Tyrolit's financial statements: they contained only a general heading for "net financing costs" the precise composition

of which Commerce could not discern.  *IDM* at 49.  The portion of Tyrolit's financial statement cited

by Commerce shows "net financing costs" as a general expenditure category that is not broken down

into specific line items.  *Id.*, citing DSMC Surrogate Value Comments, June 25, 2014, ex. 3A.

Commerce explained that the entry for "net financing costs" contains no subcategories or specific

line items, *id.*, and it also justified rejecting Tyrolit on this basis by drawing the comparison to

Trigger's financial statements as "provid[ing] detailed line items that permitted [it] to identify 'profit

and adjustment to profit' and 'SG&A and interest (SGA).'"  *Id.*  Elaborating, Commerce stated that

"when available on the record [it prefers] to use financial statements that contain the full level of

details, including line-item expenses that comprise manufacturing overhead."  Def.'s Resp. at 21,

citing *IDM* at 49.

        Based on the aforementioned discussion, a reasonable mind could accept Commerce's

conclusion that the Tyrolit statement lacked sufficient line item specificity for its purposes.  The

agency's determination, thus, was supported by substantial evidence.  DSMC claims that if there is

any "viable" financial data in Thailand, then the Department must rely on it instead of a country off

the list, DSMC's Br. at 25, but the argument seeks to hold Commerce to choosing data of lesser

quality containing "holes" from the primary surrogate country over data that is of better quality from

an on-list country.  Commerce, however, retains the flexibility to rely on an additional surrogate

country "to fill factor price 'holes' in the primary surrogate", *Policy Bulletin 04.1* at n.7, when

seeking the "best available information".  *See* 19 U.S.C. §1677b(c)(1)(B).  Having noted the

inadequacies of the KM and Tyrolit financial statements, Commerce satisfied the process of *Policy

Bulletin 04.1* to find the "best available information" and justifiably opted to consider data from

off-list countries.  This, however, is not to be construed as an affirmation that Tyrolit data can never be used.[12]

### 2.  Philippine Data

DSMC challenges Commerce's decision to go off list and use Philippine data. Commerce justified this decision by first demonstrating the inadequacies of Thai data and second by arguing that the Philippine data was the only usable data.  The former claim has already been addressed and accepted.  The latter claim is addressed herein.  Commerce explained that Trigger's financial statement represented "the only financial statements on the record of this review that are useable."  Def.'s Resp. at 3, quoting *PDM* at 22.   Although Commerce selected Thailand as the primary surrogate country, *id*. at 5, it explained that the absence of viable financial statements from that country required that it consider other options.  *Id*. at 3-4, citing *PDM* at 22.  DSMC argues that there is insufficient support on the record to use surrogate data from the off-list country the Philippines, because the Trigger data is not supported as the best data available.  *See* DSMC's Br. at 31-35.  Although, as also discussed above, this court agrees that Commerce may have cause to go off list in certain circumstances, the determinations discussed as follows are insufficiently supported.

### a.  Decision to go "Off List"

The DSMC first criticize Commerce for going "off list" in selecting a Philippine financial statement instead of one from the selected primary surrogate country.  DSMC contends that the agency's determination appears to be at odds with OP's decision not to place the Philippines on

---

[12]   If, for example, Commerce were to find on remand that Trigger, *infra*, has the inadequacies identified by DSMC, then Commerce would necessarily seem to compel to reevaluate whether the Tyrolit data should be used in light of deficiencies in both data sets and agency preference for a single surrogate country.

the list of potential surrogate countries, that the agency failed to explain the basis for its determination that the Philippines were at a level of economic development comparable with that of China, and that the prior agency precedent referenced for support does not suffice to explain Commerce's actions here.  DSMC's Br. at 27.  Commerce explains that the countries on the OP list had the "same" GNI, whereas the Philippines GNI is "comparable".  Def.'s Resp. at 17.

Determining whether GNI is "comparable" is a rather imprecise standard, as all countries are "comparable" to some degree.  Commerce appears to generally equate the term "comparable" with "approximate."  Be that as it may, "the statute does not require the Department to use a surrogate country that is at a level of economic development *most* comparable to the NME country."  *Policy Bulletin 04.1* at n.5 (emphasis in original).  Indeed, Commerce routinely resorts to "comparable" countries that are less comparable nonetheless.[13]  Such an inquiry is presumptively driven by the statutory requirement of finding the "best available" data for the case at hand.

DSMC argues that because the Philippines was not found to be at the "same" level of economic development as the PRC and the other countries on the OP list, Commerce contradicts itself in finding the Philippines nonetheless "comparable".  *See* DSMC 56.2 Br. at 26-29.  This kind of distinction, however, is a well-established Department practice insofar as Commerce views countries on its surrogate country list as being "at" the "same" level of economic comparability and it views countries outside of this band (*i.e.*, lower and upper ranges of the per capita GNI) as still

---

[13]  *See, e.g.*, *Freshwater Crawfish Tail Meat From The People's Republic of China*, Fed. Reg. 60,134 (Oct. 6, 2014) (prelim. results of admin. rev.) and attached Preliminary Decision Memorandum at 4-5 (unchanged in *Freshwater Crawfish Tail Meat From The People's Republic of China*, 79 Fed. Reg. 75,535 (Dec. 18, 2014) (final results of admin. rev.).  Wherein confronting the absence of usable data from any of the potential surrogate countries prompted Commerce to rely upon data from Spain, a country that did not appear on the list.  *Id.*

being economically comparable, only less so.  This terminology and finding is a common distinction used by the Department.[14]

Here , Commerce found that the Philippines is less economically comparable to the PRC than Thailand, but that the Philippines is still economically "comparable" to a certain degree nonetheless.  The Department articulated its policy about relying on less comparable countries in its surrogate value letter:

> This list provides you countries that are at the same level of economic development as [the PRC].  In general, the countries listed below are likely to have good data availability and quality, *i.e.*, the specificity of these countries' data are more likely to assist the team in its valuation of inputs.  However, you may also consider other countries on the case record that are significant producers of comparable merchandise if the record provides you adequate information to evaluate them.  Countries on the case record that are at the same level of economic development as [the PRC] should be given equal consideration for the purposes of selecting a surrogate country.  Countries that are not at the same level of economic development as [the PRC], but still at a level of economic development comparable to [the PRC], should be selected only to the extent that data considerations outweigh the difference in levels of economic development.

*Dep't Surr. Country Ltr* (Feb. 6, 2014) at 2.

The defendant argues that Commerce correctly found that the problems with the Thai statements outweighed the fact that Thailand is more economically comparable with the PRC than the Philippines.  By extension, they argue that the outcome is consistent with Commerce's standard written policy.

---

[14]  *See e.g. Pure Magnesium from the People's Republic of China: Preliminary Results of 2011-2012 Antidumping Duty Administrative Review*, 78 Fed. Reg. 34646 (June 10, 2013), and accompanying issues and decision memorandum at 9-12; *see also Certain Activated Carbon From the People's Republic of China: Final Results of Fourth Antidumping Duty Administrative Review; 2013-2014*, 80 Fed. Reg. 61172 (Oct. 9, 2015) and accompanying issues and decision memorandum at 6-7 (while ultimately finding no need to resort to these countries, the Department still notes that Indonesia and the Philippines are "at a less comparable level of economic development").

DSMC claims that if there is any "viable" financial data in Thailand, then the Department must rely on it instead of a country off the list. DSMC 56.2 Br. at 25. This is incorrect. Simply "viable" is not the Department's preferred standard to select surrogate values. The Department retains the flexibility to select values from other countries because it has an overriding obligation to value factors accurately, according to the "best available information." *See* 19 U.S.C. §1677b(c)(1)(B); *see also Calgon Carbon Corp. v. United States*, 40 CIT __, __, 145 F. Supp.3d 1312, 1326-28 (2016) ("Commerce has promulgated a regulation providing that 'the Secretary normally will value all factors in a single surrogate country.' This 'preference,' however, carries the day only when it is used to 'support a choice of data as the best available information where the other available data "upon a fair comparison, are otherwise seen to be fairly equal." . . . the preference on its own is not a sufficient reason to reject superior data.'") (citations omitted).

DSMC continues in this vein, arguing that non-economically comparable country can be a source only when it is "impossible" to derive the value in the primary surrogate country. DSMC's Br. at 26, citing *Dorbest*, 604 F.3d at 1371-72. This is a misstatement of the issue at hand. The *Dorbest* court merely held what the plain language of the statute indicates, *i.e.,* that the Department shall obtain surrogate values from economically comparable countries. *Dorbest*, 604 F.3d at 1371-72. The Federal Circuit clearly understood that there was flexibility in the statute in order to permit the Department to achieve the overarching goal of using the "best available information." *See id.*; 19 U.S.C. §1677b(c)(1)(B).

*Dorbest* supports the Department's policy decision to rely on Trigger in two important respects: (1) it upheld the Department's authority to rely on multiple countries, and (2) it recognized

that a particular country source could be disregarded if the data were "irretrievably tainted by some statistical flaw." *See* 604 F.3d at 1371-72.

As it were, even if this GNI data made the Philippines and PRC incomparable markets, Commerce is required to follow economic comparability and significant producer of comparable merchandise "*only to the extent possible*". *Policy Bulletin 04.1* (emphasis in original). DSMC argues that Commerce did not provide sufficient evidence on the record for its conclusion that the Philippines is economically comparable to China. DSMC's Br. at 25-29. In response, the defendant and Bosun both argue that (1) Commerce is permitted to utilize data from an economically comparable country other than the primary surrogate country or those identified by the Office of Policy and (2) Commerce here found that the Philippines is economically comparable to the PRC. Def.'s Resp. at 15-19; Bosun's Resp. at 6-10. These responses fail to address a critical shortcoming in Commerce's conclusion -- Commerce's lack of an explanation as to why and on what basis it found the Philippines and the PRC to be economically comparable.

"Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court." *NMB Singapore Ltd.* v. *United States,* 557 F.3d 1316, 1319 (Fed. Cir. 2009) (citation omitted). Here, Commerce did not articulate the basis for its conclusion that the Philippines is economically comparable to the PRC. Commerce's discussion of the issue was limited to observing that "[t]he 2012 per capita[] GNI was $5,740 for the PRC, $3,420 for Indonesia (the listed potential surrogate country with the lowest per capita GNI), and $2,470 for the Philippines." PDoc 369 at 49. Missing from this explanation is any discussion of why these figures establish the Philippines as economically comparable to the PRC. Likewise, Commerce did not identify the factors that it

considered in assessing economic comparability, or address how they influenced its decision. Regardless of its method used to determine comparability Commerce is not absolved from providing a memorandum detailing the methods used and related explanations. Accordingly, Commerce should address those on remand.

For example, in *DuPont Teijin Films v. United States,* this Court reviewed Commerce's selection of India as the primary surrogate country. 37 CIT __, __, 896 F. Supp.2d 1302, 1305 (2013). Although India was identified by OP as one of six economically comparable countries based on 2008 GNI data, plaintiffs argued that 2009 GNI data, which were subsequently placed on the record, demonstrated that India and the PRC could no longer be considered economically comparable. *Id.* at 1304-06. Commerce, however, based its determination on 2008 GNI data alone and "justified its decision to disregard the 2009 GNI data by noting that the change in disparity between India's and PRC's GNI between 2008 and 2009 was not significant enough to render India not economically comparable to the PRC." *Id.* at 1307. In finding that Commerce's analysis was "conclusory and unsupported", the court explained:

> Commerce did not provide any explanation as to why the change in proportionality was too "small" to warrant consideration or affect the economic comparability analysis, why Commerce chose to rely on a change in proportionality between two countries, or how Commerce determines what is an acceptable change in proportionality of GNI. Commerce has previously warned that there is a point at which the disparity between India's and the PRC's GNI will be too great for India to be considered economically comparable to the PRC. Commerce has not, however, provided any explanation as to why the change in disparity between the 2008 and 2009 data either does or does not rise to such a level. Commerce merely stated, without further explanation, that the change in disparity was not significant.

*Id*. at 1308 (citations omitted).  Accordingly, the court remanded the issue, directing Commerce to either provide a reasoned explanation for disregarding the 2009 GNI data or include such data in its surrogate country selection determination.  *Id*. at 1309-10.

A conclusory statement of comparability is not sufficient evidence on the record. Here, too, Commerce provided no explanation of why it determined that the Philippines is economically comparable to the PRC.  Instead, Commerce merely stated, without further elucidation, that it was so.  Thus, Commerce's conclusion that the Philippines is economically comparable to the PRC cannot be sustained without further elucidation on the record.

### b.  Trigger's Financial Data

DSMC also argues the Trigger financial data are not the "best available" records. DSMC takes issue with several perceived defects in the Trigger data.  DSMC requests a remand in order for Commerce to provide further explanation.

DSMC questions the level of detail included in Trigger's selling expenses, particularly when compared to Tyrolit.  *See* DSMC's Rep. at 31-35.  They observed that the Trigger statements did not enumerate line items for selling expenses.  To correct for this, Commerce determined the selling expenses by shifting data from other line items in the report.  DSMC noted that this was not done by Trigger's auditors and that there was no explanation as to why these line items could or should have been reclassified as such.  *Id.* at 31-32.

The defendant states that the Tyrolit and Trigger values were not distinguishable on the issue of selling expenses.  Def.'s Resp. at 24-25.  If so, the defendant undermines a reason for going off the OP list.  The defendant also states that Commerce compared the line items of Trigger and Tyrolit records, explaining that although the line items were not in the same places on the

expense reports, the same general matters are included.  Def.'s Resp. at 24.  Bosun argues further

that a lack of delineation for selling expenses does not preclude the existence of selling expenses.

*See* Bosun's Resp. at 15.  While that is true, Commerce is seeking the best available information.

If data must be shifted arbitrarily from one category to another, this draws into question the

sufficiency of that data.  Likewise, while Bosun argues that selling expenses are generally a small

part of a company's expenses, *see id.*, that does not deplete the relevance of an inquiry into their

specificity.

Further, DSMC argues Trigger primarily sold to its parent company, unlike the

subject companies who sold to unaffiliated third parties.  DSMC claims that Trigger is a captive

supplier of its parent company and this is evidenced by the fact that 99 percent of Trigger sales are

to the parent company.  DSMC's Br. at 35.  DSMC argues that this qualified Trigger as a captive

supplier, which inherently distorts Trigger's financial performance.  They attest this is proven by

Trigger's relatively low profit ratio and markups falling nearly 50 percent over the previous year.

*Id.*  In essence, the argument surmises that Trigger's performance is not driven by market conditions,

but by the needs and desires of the parent company.  *Id.*  DSMC presses that equating the subject

companies to Trigger is inappropriate because the sales structure of the subject companies sold to

non-affiliated companies, not to parent companies.  *Id.*

The defendant responds that Trigger was not alone in making sales to a parent

company.  Def.'s Resp. at 25-26.  Rather, Tyrolit and KM both had sold to parent companies.  *Id.*

The *IDM* adds that "sales to the parent company do not undermine specificity, contemporaneity, and

quality" of financial statements.  *IDM* at 51.

Bosun also expounds that DSMC gave no explanation to support its argument that this financial position makes the data unreliable.  Bosun's Resp. at 15-16.  Bosun is correct that DSMC has not proven that this financial arrangement makes the data unreliable, *id.*; however, a reasonable mind can see that the trends and information have a tendency to indicate a divergence from that of a market based or non-captive enterprise.  Bosun also argues that the same negative conjecture can be made about KM and Tyrolit, arguing that a plaintiff cannot pick and choose  on the basis of financially favorable loan conditions.  *Id.*  But, DSMC accurately identifies this as *post hoc* rationalization, which cannot be considered.  DSMC's Rep. at 15; *Burlington Truck Lines, Inc.v. United States*, 371 U.S. 156, 168-69, 83 S. Ct. 239, 246 (1962) (the court may not accept "*post hoc* rationalizations for agency action" and agency action may be "upheld, if at all, on the same basis articulated in the order by the agency itself").  Bosun also argues that the effects of this simply cancel out, Bosun's Resp. at 16, but without the data and calculations to support such conclusions, the court is unpersuaded.

Without sufficient evidence on the record, this court is left to consider conclusory statements and *post hoc* rationalizations on all sides.  The matter must therefore be remanded.  On remand Commerce is requested to provide support with the regards to whether and to what extent Trigger is a captive producer and whether that state undermines the applicability of Trigger as an appropriate surrogate.

DSMC also contends that Trigger's use of prison labor compromised the usefulness of its labor data.  DSMC's Br. at 36-38.  DSMC explains that the purpose of surrogate data is to replace a NME with a market economy*,* whereas prison laborers are unlikely to be able to negotiate market wages, reduced wages likely affect profits and expenses in Trigger data. *Id.*  Chiefly, DSMC

argues prison labor may broadly affect the overall financial experience and that the implications on the overall financial experience make Trigger an unsuitable proxy.  DSMC's Rep. at 16-17.

The defendant counters that it relies on industry-specific labor data, not Trigger's data, when it calculates labor costs.  Def.'s Resp. at 25.  The defendant also points out that DSMC did not argue the amount of prison labor or how specifically it distorted the financial statements, *i.e.*, what the effect of prison labor was, if any.  *Id.*  Bosun states that only three percent of the labor comes from inmates and that there is no evidence indicating the labor is subsidized.  Bosun's Resp. at 17.  Further, Bosum argues that the data would not be used in the labor calculation, but it could be used in the denominator, where it would be undervalued.  *Id.*

In focusing on the influence on the use of labor costs alone, Commerce and Bosun "[f]ailed to consider an important aspect of the problem."  *State Farm,* 463 U.S. at 43.  Commerce must address arguments of "cogent materiality."  *Altx Inc.,* 25 CIT 1100, 1103, 167 F. Supp.2d 1353, 1359 (2001), quoting *United States v. Nova Scotia Food Prods.*, 568 F.2d 240, 252 (2d Cir. 1977). Commerce did not merely gloss over the primary concerns raised by DSMC, but failed to address the broader implications entirely.  As Bosun identifies, three percent is the amount of labor coming from prison, but this gives little insight to what butterfly effect such a change may create.  It also does not resolve whether and how Commerce indeed considered the implication of such down the line non-market expenses.  Commerce is requested on remand to evaluate the influence of prison labor on Trigger's overall financial picture.  In particular, whether the use of this labor materially alters the financial position of Trigger, making it non-comparable.

DSMC argues that Trigger's 2013 income was so small that the tax liability increased from 10.5 percent before-tax profits in 2012 to 80.5 percent in 2013.  DSMC's Br. at 35-37.  DSMC

further argues that Commerce failed to address DSMC's concerns.  DSMC's Rep. at 35-36.  The

defendant simply asserts that the tax liability was resolved and there are no deficiencies.  Def.'s

Resp. at 25-26, citing *IDM* at 5-51.  Bosun supports this by stating that Commerce does not look into

tax situations of surrogate countries when audited locally.  Bosun's Resp. at 17.  DSMC's concern

here is over how this, in the aggregate, influence's Trigger's ability to be comparable.  *See IDM* at

50.  They do not take into account markups.  *Id.*

      The tax data alone does not give reason to question the validity of the Trigger data.

Further, DSMC fails to provide any support that would indicate Commerce's normal methodology

is to give such tax changes an increased weight.  However, given the overarching implications in an

aggregation of these elements, on remand Commerce is requested to reevaluate whether Trigger is

indeed comparable and appropriate to use as a surrogate source, or whether additional factors should

be included to account for any such variation in Trigger's data.

C.  Assignment of PRC-Wide Rate To ATM

      The last issue concerns Gang Yan's challenges to the application of the PRC-wide

rate and the rate itself.

1.

      The initiation notice for this fourth DSB review stated in relevant part that

"companies that received a separate rate in a completed segment of the proceeding that have

subsequently made changes, including, but not limited to, changes to corporate structure, acquisitions

of new companies or facilities, or changes to their official company name, should timely file a

Separate Rate Application to demonstrate eligibility for a separate rate in this proceeding."  *Initiation*

*of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in*

*Part*, 78 Fed. Reg. 79392, 79393 (Dec. 30, 2013) (initiation of admin. rev.) (footnote omitted).  The

ATM entity duly submitted a "separate rate certification" ("SRC") on February 28, 2014, a form for

firms previously awarded separate rate status.  *See* PDoc 53, CDoc 9.

        For the review at bar, Commerce selected for individual examination Bosun and

Weihai as the two entities with the largest volume of imports of subject merchandise during the

POR.  PDoc 95, CDoc 42, at 5-6.  Commerce did not conduct an "individual" examination of the

ATM entity.

        During the proceeding, and prior to publication of the preliminary determination, the

Court of Appeals for the Federal Circuit affirmed, *per curium* and pursuant to CAFC Rule 36, this

court's ruling on the ATM entity's appeal of the issue of its eligibility for a separate rate status that

Commerce reversed on redetermination, and this court sustained.  *Advanced Technology & Materials*

*Co. v. United States*, 581 Fed. Appx. 900 (Fed. Cir. Oct. 24, 2014); *see also Advanced Technology*

*& Materials Co. v. United States*, 37 CIT ___, 938 F. Supp. 2d 1342 (2013).

        During the proceeding at bar, Commerce concluded from the ATM entity's

declaration on its SRC that its status was essentially the same as that of the prior administrative

review(s).  Commerce therefore concluded the ATM entity had not demonstrated eligibility for a

separate rate pursuant to Commerce's evaluation of its *de jure* and *de facto* government control tests

and the ATM entity is properly considered part of the PRC-wide entity that includes the Central Iron

and Steel Research Institute Group and/or China Iron and Steel Research Institute Group

("CISRI").[15]   *Preliminary Results*, 79 Fed. Reg. 71980, 71981 n.11; *PDM* at 9.   Commerce

---

[15] *Advanced Technologies* noted record evidence from the investigation that CISRI "is a state owned enterprise that is wholly owned and controlled by the State Asset Supervision and

(continued...)

preliminarily assigned to the ATM entity the PRC-wide entity the rate of 164.09 percent, the margin

calculated in the original investigation.  79 Fed. Reg. at 71980-81; *PDM* at 10-11.

        Between the preliminary and *Final Results*, Commerce adjusted the PRC-wide margin

to 82.05 percent consistent with remand results on prior administrative reviews.[16]  *See* 80 Fed. Reg.

32344.  For the final results, Commerce continued to rely on the fact that the ATM entity did not

demonstrate its eligibility for a separate rate as a distinct entity from the PRC-wide entity, *IDM* at

6-7, but in accordance with judicial proceedings on the prior administrative reviews subsequent to

the preliminary fourth DSB review determination, Commerce revised downward the rate assigned

to the ATM entity from 164.09 to 82.05 percent*.  IDM* at 12.  Commerce calculated the 82.05

percent rate through a simple average of the PRC-wide rate, 164.09 percent, and the 0.00 percent

margin calculated for the ATM entity for the second administrative review of the order.  *Id*.

Commerce explained that the ATM entity's rate was based not on adverse inferences but, rather, (1)

"the rate applied to the PRC-wide entity based on the actions of the PRC-wide entity" and (2) the

ATM entity's "experience as a fully cooperative mandatory respondent" in the second administrative

review.  *IDM* at 11.  Commerce further explained that its application of the PRC-wide rate to the

---

[15]  (...continued)
Administration Commission ("SASAC"), a PRC government agency."  *Advanced Technology & Materials Co.v. United States*, 35 CIT __, __, Slip Op. 11-122, 11 (2011).

[16]  Relevant to this case, the court previously sustained redetermination of the PRC-wide margin for the first and second administrative reviews to 82.05 percent, via voluntary remand.  *See Diamond Sawblades Manufacturers Coalition v. United States*, No. 13-00078, Apr. 10, 2015, ECF No. 76 (AR1 final remand results); *Diamond Sawblades Manufacturers Coalition v. United States*, No. 13-00241, May 18, 2015, ECF No. 96 (AR2 final remand results); *see also Diamond Sawblades Mfrs. Coal. v. United States*, 39 CIT __, Slip Op. 15-105 at 16 (Sep. 23, 2015) (*DSMC AR1*) (sustaining results of redetermination of first administrative review); *Diamond Sawblades Mfrs. Coal. v. United States*, 39 CIT ___, Slip Op. 15-116 (Oct. 21, 2015) (*DSMC AR2*) (sustaining results of redetermination of second administrative review).

ATM entity, and its calculation of that rate, was consistent with its approach from the remand results

in the first and second administrative reviews.  *See IDM* at 12.

2.

Many of Gang Yan's arguments emanate from the perspective that the ATM entity

is an "individual" -- separate and apart from the PRC entity -- and therefore entitled to be considered

as such.  But that is a factually incorrect characterization of the *Final Results* for the ATM entity and

inaccurately characterizes the law.  The relevant issue here is Commerce's authority to impose a

PRC-wide rate to the ATM entity and the propriety of that rate itself, not the ATM entity's

"individual" behavior.

19 U.S.C. §1677f-1 only speaks to authorizing Commerce to "use averaging and

statistically valid samples" and "determine the weighted average dumping margins for a reasonable

number of exporters or producers by limiting its examination to --  (A) a sample of exporters,

producers, or types of products that is statistically valid based on the information available to the

administering authority at the time of selection, or  (B) exporters and producers accounting for the

largest volume of the subject merchandise from the exporting country that can be reasonably

examined."   19 U.S.C. §1677f-1(a), (c)(2).

By contrast, Commerce's authority to impose a "PRC-wide" margin emanates from

its authority to determine an estimated "all others" rate under 19 U.S.C. §1673d(c)(1)(B), not 19

U.S.C. §1677f-1.  *See Sigma Corp. v. United States*, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997).  And

in accordance with *Antidumping Proceedings: Announcement of Change in Department Practice*

*for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the*

*Nonmarket Economy Entity in NME Antidumping Duty Proceedings*, 78 Fed. Reg. 65963, 65970

(Nov. 4, 2013), Commerce will now review that "all others" PRC-wide rate if it receives a review request. 19 U.S.C. §1675(a)(1). Section 1677f-1(c) has no bearing on the determination of that rate or its application to companies within the PRC-wide ambit, such as the ATM entity: once a company is determined ineligible for a separate date, 19 U.S.C. §1677f-1 ceases to have any applicability because the question of the authority to apply that rate to all companies within the PRC-wide ambit has been answered in the affirmative by *Sigma Corp.* and *Transcom, Inc. v. United States*, 294 F.3d 1371, 1379 (Fed. Cir. 2002) (conditionally reviewed companies also are deemed to have received sufficient notice in the initiation).

During the course of this review, Commerce changed its approach to the standards for separate rates, due to earlier decisions of this court. As a result, Commerce declared the ATM entity part of the PRC-wide entity. Further, as mentioned, Commerce modified its prior practice of "conditionally" reviewing the NME entity whenever, even absent a request, review of an exporter requesting a separate rate was unable to demonstrate that it was separate from the PRC-wide entity, such that Commerce's current practice is to conduct an administrative review of the NME-wide entity if it receives a request for, or self-initiates, a review of that entity. 78 Fed. Reg. at 65970.

The PRC-wide rate of 82.05 percent for this fourth DSB review is the same rate as that sustained for prior administrative reviews, and Commerce found it to be of continued relevance for this review. Gang Yan argues that the PRC-wide entity was not a named entity under review (conditional or otherwise), so the fact that the ATM entity (of which BGY is a part) was determined to be part of the PRC-wide entity means that BGY's shipments during the POR must be liquidated "as entered" in accordance with 19 C.F.R. §351.212(c) (in the absence of request for review of an antidumping duty order, imports are to be liquidated as entered). If by liquidated "as entered", Gang

Yan means subject to the PRC-wide rate of 82.05 percent, *see* 80 Fed. Reg. at 32345, the court

agrees.  Gang Yan's argument otherwise appears to confuse what it means to be "subject to" a

review and the actual review process, but 19 U.S.C. §1675(a) is clear in stating that Commerce will

"review and determine" the amount of any antidumping duty for a 12-month review period if a

request for such review is received.  Which, of course, does not imply that if no request for review

is received then subject merchandise will enter without antidumping duties imposed -- it simply

means that the rate from the prior review period will carry forward.  And if by liquidated "as

entered", Gang Yan means Commerce is obligated to issue liquidation instructions that do not

impose the PRC-wide rate of antidumping duties on the ATM entity's subject merchandise, the

argument is untenable because the status of the ATM entity changed during the course of the review

when it lost its entitlement to a rate separate from the PRC-wide entity.  That is, the "automatic

assessment" provisions of 19 C.F.R. §351.212(c) indeed apply, but they apply to and as the PRC-

wide entity rate for purposes of the ATM entity's subject merchandise's liquidation.

Elsewhere, Gang Yan's arguments conflate its identity as an "individual" company

with the identity of the PRC-wide entity.  Gang Yan intimates that the ATM entity "responded" as

part of the PRC-wide entity and "participated" in the review as a part of the PRC-wide entity.

However, the record belies that stance, as the ATM entity specifically sought separate rate status for

BGY and filed no-shipment certifications for its other three exporters.  Further, nothing of record

indicates the ATM entity was authorized to speak for the PRC-wide entity or otherwise had standing

to do so.  Gang Yan does not here purport to represent, or be representative of, that PRC-wide entity.

Gang Yan also argues that the 164.09 percent rate from the investigation is an adverse

facts available rate, *see* 19 U.S.C. §1677e, and that there is nothing on the record indicating the PRC-

wide entity failed to cooperate and no finding of non-cooperation of the PRC-wide entity by Commerce, and that an adverse rate cannot be "assigned" to the ATM entity.   The argument misleads what transpired on the record for two primary reasons.  First, the 164.09 percent rate is only tangentially relevant at this point, as the rate for the PRC-wide entity from the previous review that Commerce carried forward to this review was not that rate but reflected the fact that as a consequence of judicial proceedings over the investigation, the PRC-wide entity was reconsidered to consist of a portion that had in fact cooperated as well as an uncooperative portion.  Rather than attempt to weight-average those portions for purposes of subsequent administrative reviews, Commerce generously applied a simple average that actually inured to the PRC-wide entity's benefit. The ATM entity has, from then onwards, been considered a part of that PRC-wide entity, and the ATM entity's "separate" existence or behavior ceased to have further meaning apart from the impact that it had on the reconsideration of the margin from the investigation that carried forward to subsequent administrative reviews that were judicially challenged and subsequently modified as a consequence thereof.  *See*, *e.g.*, *Peer Bearing Co.-Changshan v. United States*, 32 CIT 1307, 1313, 587 F. Supp.2d 1319, 1327 (2008) ("[T]here is no requirement that the PRC-wide entity rate based on AFA relate specifically to the individual company.  It is not directly analogous to the process used in a market economy, where there is no countrywide rate.  Here, the rate must be corroborated according to its reliability and relevance to the countrywide entity as a whole.") (citations omitted).

Second, "cooperation" implies responsiveness to a request for action, and although the PRC-wide entity was "subject to" the review and the results of it, as Gang Yan acknowledges, the PRC-wide entity was not actively reviewed because Commerce did not receive a request for review of the PRC-wide entity.  Gang Yan argues that if Commerce had any questions about whether

non-responding companies were controlled by the PRC government, it could simply have asked that government, but the argument inverts Commerce's well-established presumption regarding the PRC-wide entity and the burden of proof thereon. Nothing of record indicates that the PRC government could not itself, for example, have requested review of the PRC-wide entity, via, for example, the agency of CISRI or SASAC. *See* 19 U.S.C. §1677(9)(B) (defining the government of a country in which subject merchandise is produced or manufactured, or from which such merchandise is exported, as an "interested party"). In this instance, because the PRC-wide entity was not itself being reviewed, the fact that there is no finding of cooperation, partial cooperation, or non-cooperation of the PRC-wide entity on the record is irrelevant.

Gang Yan further argues Commerce failed to corroborate the PRC-wide rate. However, once Commerce established the PRC-wide rate, it was permitted to use that rate in the manner it did in this review. Gang Yan identifies no basis for departing from the court's prior rulings sustaining Commerce's application of the PRC-wide rate to the ATM entity. Nonetheless, as those rulings are currently on appeal to the Federal Circuit, Commerce of course retains the authority to revisit this issue in consequence of any decision of that court during remand of this matter to Commerce. The court considered parties' remaining arguments and finds they lack merit.

*Conclusion*

For the above reasons, Diamond Sawblades and Parts Thereof from the Republic of China, 80 Fed. Reg. 32344 (June 8, 2015), is hereby remanded to the International Trade Administration, U.S. Department of Commerce for further proceedings consistent with this opinion.

The parties shall provide comment, or indication of none, on the sufficiency of the

information indicated to be redacted from the confidential version of this opinion (indicated

above by double bracketing) to the Clerk of the Court within seven (7) days, including any

indication of information that should be but is not presently indicated as subject to redaction.

The results of remand shall be due July 31, 2017, whereupon by the fifth business

day thereafter, the parties shall file a joint status report as to a proposed scheduling of comments,

if any, on the remand results, as well as a proposed page limitations(s) thereof.

**So ordered.**

_____/s/  R. Kenton Musgrave_____
R.  Kenton Musgrave, Senior Judge

Dated:  March 31, 2017
              New York, New York