Slip Op. 18 - 26

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| DIAMOND SAWBLADES MANUFACTURERS' COALITION, | : : : |
| Plaintiff, | : : |
| v. | :  Before: R. Kenton Musgrave, Senior Judge : |
| UNITED STATES, | : Consol. Court No. 15-00164 : |
| Defendant, | : **PUBLIC VERSION** : |
| and | : : |
| BEIJING GANG YAN DIAMOND PRODUCTS COMPANY, GANG YAN DIAMOND PRODUCTS, INC., CLIFF INTERNATIONAL LTD., HUSQVARNA CONSTRUCTION PRODUCTS NORTH AMERICA, INC., HEBEI HUSQVARNA-JIKAI DIAMOND TOOLS CO., LTD., WEIHAI XIANGGUANG MECHANICAL INDUSTRIAL CO., LTD., BOSUN TOOLS CO., LTD., and BOSUN TOOLS INC., | : : : : : : : : : : |
| Defendant-Intervenors. | : : |

## OPINION AND ORDER

[Re-remanding 2012-13 administrative review of antidumping duty order on diamond sawblades and parts thereof from the People's Republic of China.]

Dated: March 22, 2018

*Daniel B. Pickard*, *Maureen E. Thorson*, and *Stephanie M. Bell*, Wiley, Rein & Fielding, LLP, of Washington, DC, for plaintiff.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant. With him on the brief were *Chad A.*

*Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of Counsel on the brief was *Paul Keith*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

*Gregory S. Menegaz, J. Kevin Horgan*, and *Alexandra H. Salzman*, deKeiffer & Horgan, PLLC, of Washington, DC, for defendant-intervenors Bosun Tools, Co., Ltd. and Bosun Tools Inc.

Musgrave, Senior Judge: *Diamond Sawblades and Parts Thereof From the People's Republic of China* ("PRC"), 80 Fed. Reg. 32344 (June 8, 2015) (final antidumping duty administrative review of 2012-13 period) ("*Final Results*"), as explained by its accompanying issues and decision memorandum, Public Record Document ("PDoc") 354 (June 2, 2015) ("*IDM*"), was previously remanded to the International Trade Administration, U.S. Department of Commerce ("Commerce" or "Department") for further consideration of its methodology for surrogate valuation of steel cores (diamond sawblade parts and subject merchandise in their own right) and its selection of financial statement(s) for use in determining surrogate financial ratios. *See Diamond Sawblades Manufacturers' Coalition v. United States*, 41 CIT ___, 219 F. Supp. 3d 1368 (2017). The results of remand are now before the court, ECF No. 83 (Sep. 22, 2017) ("*Redetermination*"), and the plaintiff argues further remand is needed with respect to both issues. The court agrees, as follows.

*Discussion*

I. Valuation of Steel Cores

As mentioned previously, in the original proceeding Commerce expressed a preference for valuing factors of production ("FOPs") using official import data[1] but abandoned that

---

[1] *See, e.g., Diamond Sawblades and Parts Thereof from the People's Republic of China*, 78 Fed. Reg. 11143 (Feb. 15, 2013) (final results of admin. rev.; 2009-2010) and accompanying issues (continued...)

approach in subsequent proceedings with respect to valuing the steel cores after concluding that the tariff schedules of Commerce's choice of primary surrogate country, Thailand, provided imprecise coverage of those products. The agency then resorted to valuing both self-produced and purchased cores based on the FOPs reported by respondents for their production, *i.e.*, a "build-up" methodology.[2] *See IDM* at 38. During the underlying administrative review, the plaintiff Diamond Sawblades Manufacturers' Coalition ("DSMC") requested Commerce to consider returning to the use of import data, in accordance with Commerce's earlier-expressed preference therefor, and consider in particular the use of data for Thai Harmonized Tariff Schedule (HTS) item 8202.31.10, which covers steel "toothed blanks" (*i.e.*, cores for circular sawblades), DSMC arguing that the provision was specific to cores for circular sawblades with a working edge of steel. *See* PDoc 232.[3]

        Commerce declined, DSMC appealed, and the valuation of cores was remanded for reconsideration due to three broad reasons: First, Commerce had rejected using the Thai HTS data partly because they had resulted in "unreasonably high" surrogate values, but Commerce did not

---

[1] (...continued)
and decision memorandum ("I&D Memo") at cmt. 11 ("we prefer country-wide information such as government import statistics to information from a single source and we prefer industry-wide values to values of a single producer because industry-wide values better represent prices of all producers in the surrogate country.").

[2] *See id.*; *Diamond Sawblades and Parts Thereof Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 36166 (June 17, 2013) and accompanying I&D Memo at cmt. 8; *Diamond Sawblades and Parts Thereof Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 35723 (June 24, 2014) and accompanying I&D Memo at cmt. 12.

[3] DSMC also placed information on the record indicating that the production process used and costs incurred to make steel cores for DSB cores and cores with metal working parts were largely identical. *See* CDoc 174, PDoc 226, at Att. 1.

Court No. 15-00164 **Public Version** Page 4

identify an adequate benchmark for making such an assessment. Slip Op. 17-36 at 7-8. Second, Commerce had rejected DSMC's use of the actual core purchase prices of respondent Weihai Xiangguang Mechanical Industrial Co., Ltd., defendant-intervenor herein ("Weihai"), to demonstrate the reasonableness of the Thai data but had then relied on these same purchase prices to support its use of the build-up methodology. *Id*. at 8-9. Third, the finding that the merchandise covered by HTS item 8202.31.10 is meaningfully different from the cores used in the production of subject merchandise was unsupported. *Id*. at 9-11. Accordingly, the determination as a whole was concluded unsupported by substantial evidence, and the issue was remanded for reconsideration. *Id.* at 12-13.

During remand, in its draft results Commerce continued to use the build-up methodology to value purchased cores, reasoning that it provided more accurate valuation of those than would the Thai import data, as the later were "a broad category covering many chemical and physical compositions." *See IDM* at 9. Commenting on the draft, DSMC argued that the build-up methodology continued to produce absurd results. DSMC Draft Cmts, R[4]-PDoc 24, at 13-18. From DSMC's perspective, the build-up methodology resulted in surrogate values for purchased cores that significantly diverged from the values for self-produced cores with similar characteristics, *id*. at 14-15, and it contended that [[

]], *id*. at 15-18. Thus, given that the agency's apparent intent in using the build-up

---

[4] "R" denotes reference to remand administrative record documents.

methodology was to recreate the full market value of self-produced cores, DSMC contended that [[                                                                                                                    ]]. *Id*. DSMC further pointed out that its original appeal of the agency's core valuation methodology encompassed the valuation methodology as applied to Bosun as well as Weihai. *Id*. at 13 n.49.

In the final remand results, Commerce made no further change to the core valuation methodology employed in the draft results. *Redetermination* at 16-20. Commerce explained that the changes it had made only affected the valuation of Weihai's cores, as respondent Bosun Tools Co., Ltd.[5] had used a different reporting methodology for purchased cores. To reach that result, the *Redetermination* maintains that the decision not to rely upon the AUV for merchandise under Thai HTS 8202.31.10 is due to finding the build-up methodology more product-specific than using the AUV for merchandise under that HTS item.[6] With respect to the determination to reject DSMC's comparison between the Thai AUV and Weihai's purchase prices from NME suppliers, the *Redetermination* reiterates that the Thai AUV were not compared to those purchase prices in order to evaluate the reasonableness of the Thai AUV substantively but rather to identify the distortion in

---

[5] Herein, together with Bosun Tools Inc.,"Bosun".

[6] *See Redetermination* at 5-12 (concluding to use the build-up methodology based on product specificity). Therefore, or thereby, Commerce abandoned the conclusion that the Thai AUV is "unreasonably high" in preferring build-up methodology over import data. The *Redetermination* also explains that "build up" methodology is based largely on import data in any event. Elaborating thereon, the defendant states: that products covered by Thai HTS 8202.31.10 are different from diamond sawblades; that steel for diamond sawblades has certain chemical and physical compositions to meet a minimum level of hardness to satisfy specific safety requirements; that Thai HTS 8202.31.10 covers steel sawblade blanks of all chemistries and sizes; and that there is no information on the record regarding the chemical or physical composition of the products covered by Thai HTS 8202.31.10 in contrast to record detail of the chemical and physical compositions of the cores Weihai purchased and the steel Weihai consumed in its own production of cores. Def's Resp. at 16, referencing *Redetermination* at 8-10.

DSMC's comparison methodology.[7] Commerce claims that, as corrected for inconsistent quantity units, the build-up methodology properly accounts for core weight.[8]

DSMC here argues Commerce still fails to explain or support its cores build-up methodology because the *Redtermination* still does not account for the full amount of steel used to produce cores and results in inaccuracy. DSMC Comments at 16-21. "The agency has valued purchased cores using the weight of the steel in the core as a starting point, while it has valued self-produced cores using the weight of the steel employed in producing those cores as a starting point" and "[t]he record indicates that the amount of steel used to produce a core is greater than the amount of steel that ultimately is incorporated into the core; *i.e.*, the production of cores from steel sheet/plate results in scrap loss." *Id*. at 19, referencing, *inter alia,* DSMC's Draft Remand Comments at 15-18 & Ex. 2. In other words, "the agency has valued purchased cores as though scrap was not generated at all in the production of such goods, although nothing on the record suggests that this is possible." *Id*. at 20, referencing *id*. at 16 & Ex. 2. *See Redetermination* at 18-19.

The defendant contends that Commerce's methodology did take scrap into account in the volume of steel used to produce the cores and that DSMC's argument "does not take into account our offset of scrap from self-produced cores in the normal value calculation" as the reason

---

[7] *See Redetermination* at 11-12. In the *Final Results*, Commerce found that DSMC's comparison did not properly take the weight of Weihai's purchased cores into account. *IDM* at 39. To demonstrate, Commerce tested the comparison methodology by making the same comparison after taking core weight into account and concluded that DSMC's proposed AUV overvalued cores. *See Redetermination* at 11; *IDM* at 39. In other words, the defendant quotes, Commerce made the comparison only to "highlight flaws in the methodology DSMC used to compare its proposed Thai AUV with Weihai's purchase prices from NME suppliers." *Redetermination* at 11.

[8] *Id*. at 12.

why DSMC's comparison showed significant difference in valuation for Weihai's purchased cores. *Id*. at 18. Noting DSMC's statement that it would not oppose applying a scrap offset to the cores Weihai purchased if Commerce also compensates for the larger quantity of steel consumed,[9] the defendant also contends that DSMC did not argue for a scrap offset in the build-up methodology for purchased cores in its comments to Commerce, as DSMC had only argued that Commerce should [[

]]. *See* DSMC Draft Remand Comments at 17.

Whether that is mere semantics, the defendant fundamentally relies on Commerce's explanation for using the quantity of steel that it did in its build-up methodology: "the purchased core would be the core itself, exclusive of scrap that may have resulted from producing the core". *Redetermination* at 18. The defendant argues that applying a scrap offset for the purchased cores would be inconsistent with Commerce's practice regarding scrap offsets, which is not to grant a scrap offset without production or inventory records of scraps produced. Def's Resp. at 20, referencing *American Tubular Products, LLC v. United States*, 847 F.3d 1354, 1361 (Fed. Cir. 2017) (affirming Commerce's denial of scrap offset due to respondent company's "failure to document scrap production"). In this case, the defendant continues, Commerce has no records indicating the volume of scrap produced by Weihai's unaffiliated NME suppliers. Def's Resp. at 20. And without the information necessary to apply a scrap offset, and without detailed information on the production process of Weihai's NME suppliers, the defendant persists, Commerce valued the cores based on the volume of steel actually contained in the cores, which the defendant argues was reasonable.

---

[9] *See* DSMC Comments at 20.

Generally speaking, Commerce's grant of a scrap offset to a respondent's NV is on a conceptually different footing than consideration of the scrap that would be produced in production by a supplier. DSMC's fundamental argument is this:

> [T]he difference between the agency's calculated value for the self-produced cores in the example and the value for purchased cores is greater than [[   ]]. DSMC's Comments at Exhibit 1. The values for the self-produced cores are [[   ]] than the values calculated for the purchased cores. *Id*. [at] 7[.] There is a significant quantum of the difference in value, accordingly, that is not attributable to differences in steel grade. Indeed, even if one applies the same surrogate value to both types of steel, the value of the self-produced cores ranges from [[   ]], still [[   ]] higher than the purchased core valuation of [[   ]]. This may go some way to explaining why the agency did not attempt to illustrate the flaws in DSMC's example by presenting a comparison between purchased and self-produced cores that use the identical grade of steel. Doing so does not resolve the differences in valuation; rather, it confirms that such differences exist.
>
> The Department next confirms that the difference in the valuation of similar, if not identical, self-produced and purchased cores is at least partly a function of the distinct treatment of scrap between cores that are purchased and those that are self-produced. [*Redetermination*] at 18-19. This too confirms that the problem pointed out by DSMC -- significantly divergent values for products with highly similar, if not identical, cores -- exists. It also, as indicated in DSMC's comments on the draft results, suggests the reason why the problem exists. DSMC's Comments at 15-18. But contrary to the agency's apparent assumption, [*id.*] at 18-19, explaining why a problem exists does not make the problem go away.

DSMC Comment at 18-19 (bracketing added).

The court can agree in part. The implication that application of a scrap offset for the self-produced cores aligns their weights with those of purchased cores is not an unreasonable explanation for why Commerce declined to adjust its build-up methodology in the manner suggested by DSMC, but in the final analysis the defendant's response does not persuade that a problem does not still exist with respect to the build-up methodology as applied to purchased cores in light of the apparent disparity in value(s) when compared to the value(s) the methodology sums for the self-

produced cores, as outlined above by DSMC. *Ceteris paribus*, no rational producer would continue to self-produce cores if purchased cores can be had at values [[       ]] lower than that of self-produced cores. There may be another explanation, but assuming that is not an inaccurate characterization of the problem (*i.e.*, the extent or degree of discrepancy), the court is not in a position to opine a reconciliation, which is a matter that at least requires further reconsideration and elucidation via second remand. *Cf.*, *e.g.*, 19 U.S.C. §1677e(a)(1), *with*, *e.g.*, *Shantou Red Garden Foodstuff Co. v. United States*, 36 CIT ___, ___, 815 F. Supp. 2d 1311, 1317 (2012) (use of facts otherwise available authorized when necessary information is not available in the record).

## II. Selection of Surrogate Financial Statement(s)

Commerce was also requested to address issues potentially undermining the suitability of the financial statements for Trigger Co. Philippines, Inc. ("Trigger") as an appropriate surrogate, including Trigger's status as a captive producer, its use of prison labor and certain tax liabilities, as well as clarify Commerce's conclusion that the Philippines, which was not on the list of economically-comparable countries prepared by Commerce's Office of Policy for the review ("OP List"), was nonetheless concluded to be at a comparable level of economic development to the PRC in the final results. *See* Slip Op. 17-36 at 27, 29-33 (identifying financial statements issues). On remand, in order to address those, Commerce solicited additional financial statement information for countries on the OP List. DSMC submitted KM's 2012 financial statements, and both DSMC and Bosun submitted 2013 financial statements for Thai Gulf, a producer of comparable merchandise from the primary surrogate country.[10] Commerce claims its selection of Thai Gulf's financial

---

[10] Bosun also submitted financial statements for two other companies. DSMC argued those financial statements were problematic, and Commerce agreed. *See Redetermination* at 13-14.

statements mooted the concerns with respect to Trigger's financial statements. *See Redetermination* at 12-13.[11] And as it had done for the original final results, Commerce on remand declined to use KM's financial statements claiming they lacked detail, specifically their failure to provide beginning and ending inventories. *See id.* at 22.

DSMC here challenges Commerce's decision to rely upon the Thai Gulf financial statements alone rather than an average or combination of the 2013 Thai Gulf financial statements and the 2013 KM financial statements. *See* DSMC's Draft Remand Comments, R-PDoc 27, R-CDoc 9, at 7-10. DSMC argues that Thai Gulf and KM are both producers of comparable merchandise and that Thai Gulf's financial statements are no more detailed regarding inventory movements than KM's financial statements. *See id.* at 11. DSMC therefore argues that Commerce cannot justify using Thai Gulf's financial statements alone and not use KM's as well by invoking the level of detail of each statement. *See* DSMC Comments at 14 ("[a]ccordingly, the agency's rationale for finding Thai Gulf's statement, but not KM's statement, sufficiently detailed is unclear").

Specifically, DSMC maintains that the agency's decision to reject KM's 2013 financial statements is not adequately explained or supported because the 2013 Thai Gulf financial statements are actually no more detailed regarding inventory movements than KM's statements and that in fact it is actually KM's that is the more detailed of the two schedules with respect to inventory movements since it includes a line item for "supply" in addition to values for finished goods and raw materials at the end of the 2012 and 2013 financial years. *Cf.* DSMC Original SV Submission at Ex.

---

[11] The defendant contends that Thai Gulf's statements do not suffer from the same shortcomings as Trigger's, *i.e.*, there is no indication on the record that Thai Gulf is a captive producer, employs prison labor, or would otherwise not serve as a suitable surrogate, and the reliability of the 2013 Thai Gulf financial statements is unchallenged here. *See* Def's Resp. at 11, referencing *Redetermination* at 12-13 (discussing the selection of the Thai Gulf statements).

1A, p. 9, *with* DSMC Submission of New Financial Statements at Ex. 5, p. 5.  Given that Thai Gulf's financial statements contain no greater level of detail than KM's with respect to inventory movements but was deemed suitably detailed, DSMC argues, it is not clear what type of "beginning and ending inventories" information the agency perceived as fatally missing from KM's statement.

Elaborating, DSMC argues that while a lack of "beginning and ending inventories" is the only specific flaw Commerce identified in KM's financial statements, the agency implied that other relevant, but unidentified, data were missing as well. *See Redetermination* at 22.  In the *Redetermination*, Commerce cites to its *Final Results* in explaining its decision on remand to reject KM's 2013 statement for lack of detail; however, the *Final Results*, like the remand results, indicate only that "KM's financial statements lack detailed line items such as inventories open and closed." *IDM* at 47.  This, DSMC contends, does not identify or adequately explain what other relevant information the agency perceived as missing from KM's financial statements.

DSMC's comments provide a side-by-side comparison of KM's and Thai Gulf's 2013 statements, and the comparison indicates that the statements are highly similar, without any obvious deficiency in KM's 2013 financial statements as compared with Thai Gulf's.  DSMC details that both statements begin with approximately one page of auditor's notes before providing high-level balance sheet information on current and non-current assets, liabilities, and shareholders'/owners' equity;[12] both contain profit and loss statements that, in turn, contain an equal number of line items for identical categories of income/expenses;[13] both contain equally detailed statements of changes

---

[12] *Cf.* DSMC Original SV Submission at Ex. 1A, pp. 1-2, *with* DSMC New Submission at Ex. 5, pp. 1-2.

[13] *Cf.* DSMC Original SV Submission at Ex. 1A, p. 3, *with* DSMC New Submission at Ex. 5, p. 3.

in shareholders' equity;[14] both provide schedules for costs of manufacturing, selling expenses, administrative expenses, and other expenses;[15] and the notes to both companies' statements first provide general information and then describe the basis for the preparation of the statements and accounting policies before providing schedules for (1) cash/cash equivalents, (2) inventories, (3) property, plant & equipment, (4) other non-current assets, (5) trade accounts payable, and (6) other current liabilities.[16] KM's statement also includes schedules for long term loans and significant expenses, while Thai Gulf's statement also includes a schedule for other revenue.[17]

In other words, DSMC argues, neither schedule appears to be missing anything significant, and neither company's financial statements uniformly appear of greater detail with respect to the number of line items in particular schedules; thus, DSMC argues, it is unclear from the record why the agency found KM's financial statements to be insufficiently detailed in comparison with Thai Gulf's as there is no explanation of what other information the agency perceived as missing. Accordingly, DSCM contends, the agency's rationale for finding Thai Gulf's financial statements but not KM's sufficiently detailed is unclear, particularly since KM's statement appears to contain more detail regarding inventories than Thai Gulf's, and although the agency alluded to other issues, it did not explain what those issues were, and review of the schedules

---

[14] *Cf.* DSMC Original SV Submission at Ex. 1A, p. 4, *with* DSMC New Submission at Ex. 5, p. 3.

[15] *Cf.* DSMC Original SV Submission at Ex. 1A, pp. 5-7, *with* DSMC New Submission at Ex. 5, pp. 7-8.

[16] *Cf.* DSMC Original SV Submission at Ex. lA, pp. 8-11, *with* DSMC Submission of New Financial Statements at Ex. 5, pp. 3-6.

[17] *Cf.* DSMC Original SV Submission at Ex. lA, pp. 8-11, *with* DSMC Submission of New Financial Statements at Ex. 5, pp. 6-7.

themselves appears to show that they are highly similar in terms of detail overall. *See generally* DSMC Comments at 9-15.

　　　　The defendant responds by contending that DSMC failed to exhaust its administrative remedies before Commerce in not arguing that the level of detail in KM's financial statements required their inclusion, *see* 28 U.S.C. §2637(d), and it also argues Commerce's determination that the 2013 Thai Gulf financial statements had a greater level of detail than the KM financial statements was substantially supported by record evidence in any event. Therefore, the defendant maintains, Commerce's determination to rely on the Thai Gulf financial statements alone but not the 2013 KM financial statements is supported by substantial evidence and in accordance with law. The defendant further argues DSMC's own submissions to Commerce recognize a greater level of detail for Thai Gulf's statements than KM's statements in that the Thai Gulf statements provide finished goods beginning and ending balance line items which can be used to populate the "Change in Finished Goods" column. Def's Resp. at 13, referencing DSMC Submission of New Financial Statements (July 25, 2017) ("DSMC New Submission"), R-PDocs 4-5, at Ex. 5. By contrast, the worksheet DSMC provided to accompany KM's 2013 financial statements provides a single line item for "Direct Materials" but no line item information to populate the "Change in Finished Goods" column. *Id*. at 13-14, referencing Letter from Wiley Rein LLP to Sec'y Commerce, re: Diamond Sawblades and Parts Thereof from the People's Republic of China: Submission of Surrogate Value Information (Nov. 4, 2014), PDoc 263, CDoc 201, at Ex. 1A ("DSMC Original SV Submission"). The defendant explains that Commerce uses the data for these line items in calculating the materials included in the cost of goods sold, which in turn is used in the calculation of financial ratios for overhead, profit,

and selling, general, and administrative expenses. *See*, *e.g.*, Surrogate Values Spreadsheet, R-PDoc 17, at Financial Ratios (R) Thai Gulf (providing the data and calculations to determine financial ratios based on the Thai Gulf financial statements). Thus, the defendant insists, DSMC's own submissions indicate that KM's 2013 statements lacked details for inventories open and closed.

As noted above, the standard of review applicable to Commerce's decisions in administrative reviews, including decisions on remand, requires that the agency provide a 'rational connection between the facts found and the choice made" and "articulate a satisfactory explanation for its action.'" *E.g. Baroque Timber Indus. (Zhongshan) Co. v. United States*, 36 CIT ___, ___, 971 F. Supp. 2d 1333, 1339-40 (2014) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) and *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)). This means more than merely offering a conclusory statement of its findings. *Shanghai Foreign Trade Enterprises, Co. v. United States*, 28 CIT 480, 488 (2004); *Yantai Oriental Juice Co. v. United States*, 26 CIT 605, 611 (2002).

On the one hand, the defendant's further explanation, above, of how Commerce used the Thai Gulf statement, while helpful, is essentially *post hoc* as to Commerce's general statement that the KM statement "lacked some details such as beginning and ending inventories". And comparison of KM's 2013 statement with Thai Gulf's 2013 statement does not apparently, *see supra*, reveal greater detail with respect to inventory movements in one or the other, nor does it reveal any other appreciable deficiencies in KM's statement. Rather, as DSMC argues, the two statements appear highly similar in overall detail. Furthermore, if the defendant's explanation above is complete and accurate, it still remains unclear to the court whether the KM statement is unusable,

for example whether the statement provides sufficient information to discern what the "change in finished goods" is, or, for that matter, the extent to which that is relevant or necessary, given that the KM statement provides amounts for "raw materials for manufacturing," "supply" and "cost of manufacturing," among other line items. If all else is equal, comparison of the 2013 KM financial statements *vis-à-vis* the Thai Gulf financial statements would seem commonsensical.

On the other hand, the defendant appears correct that DSMC did not argue this "level" of detail of KM's financial statement before Commerce, and therefore the latter cannot be faulted for not undertaking a side-by-side comparison of the financial statements in this instance. *See*, *e.g.*, *Jiaxing Brother Fastener Co. v. United States*, 34 CIT 1455, 1465, 751 F. Supp. 2d 1345, 1355 (2010) (the court shall, "where appropriate, require the exhaustion of administrative remedies" in trade cases) (quoting 28 U.S.C. § 2637(d)). *see also Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (while not absolute, the statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies"). Nonetheless, in view of DSMC's presentment, the administrative determination needs to be remanded for further explanation in accordance with the foregoing, because if the DSMC is correct, and its presentment here is accurate, then the determination as it stands would seem to be at odds with administrative practice. *See*, *e.g.*, *Dupont Teijin Films v. United States*, 38 CIT ___, ___, 997 F. Supp. 2d 1338, 1346 (2014) ("[w]hen the record contains multiple contemporaneous financial statements from different producers, Commerce's practice is to average the financial statements to eliminate any potential distortions that may arise from any one producer's statement" (referencing *Dorbest Ltd. v. United States*, 604 F.3d

1363, 1368, 1374 (Fed. Cir. 2010)); *Jiaxing Bro. Fastener Co. v. United States*, 38 CIT ___, ___, 11 F. Supp. 3d 1326, 1331 (2014) ("Commerce has a stated preference . . . to use multiple financial statements to calculate surrogate financial ratios"), *aff'd*, 822 F.3d 1289 (Fed. Cir. 2016).

The point here is not a reweighing of the evidence, only that DSMC's comments call into question whether it can be concluded that substantial evidence of record supports Commerce's rejection of the 2013 KM financial statement and its reliance upon the 2013 Thai Gulf statement alone. The defendant's response does not address the entirety of the DSMC's arguments, and based on the record it is therefore unclear that a rational connection between it and the agency's choice has been made, nor has the agency adequately explained that choice or cited record evidence that would support it. Thus, it cannot be concluded at this time that substantial evidence supports the finding that KM's 2013 financial statements lack the necessary details for the purpose of determining the margin(s) of dumping.

### III. Separate Rate Respondents

DSMC also argues that any further changes to the margins for the mandatory respondents would impact the weighted-average calculation of the dumping margin assigned to non-selected companies that demonstrated their eligibility for a separate rate. *See* DSMC Comments at 21-22. In accordance with the foregoing, this issue must be remanded as well.

Court No. 15-00164                          **Public Version**                                   Page 17

*Conclusion*

For the above reasons, *Diamond Sawblades and Parts Thereof from the Republic of China*, 80 Fed. Reg. 32344 (June 8, 2015), is hereby remanded again to the International Trade Administration, U.S. Department of Commerce for further proceedings consistent with this opinion.

The parties shall provide comment, or indication of none, on the sufficiency of the information indicated for redaction from the confidential version of this opinion (indicated above by double bracketing) to the Clerk of the Court within seven (7) days, including any indication of information that should be but is not presently indicated as subject to redaction.

The second results of remand shall be due June 20, 2018, and by the fifth business day after the filing thereof, the court anticipates that the parties will file a joint status report with a proposed schedule for further comments, if any, on those results.

**So ordered.**

                                                           /s/  R. Kenton Musgrave
                                                  R.  Kenton Musgrave, Senior Judge

Dated:  March 22, 2018
        New York, New York